## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**MALCOLM C. SWASEY**,                          Chapter 7
    Debtor                          Case No. 11-20627-JNF


~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**TRENWICK AMERICA REINSURANCE
CORPORATION and UNUM LIFE
INSURANCE COMPANY OF AMERICA,**
    Plaintiff
v.                                               Adv. P. No. 12-1040
**MALCOLM C. SWASEY,**
    Defendant


~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Motion for Summary Judgment filed by the

Plaintiffs, Trenwick America Reinsurance Corporation and Unum Life Insurance Company

of America (the "Plaintiffs"), with respect to the Plaintiffs' Complaint to Determine Debt

Nondischargeable pursuant to 11 U.S.C. § 523(a)(6). Malcolm C. Swasey ("Swasey" or the

"Debtor") filed an Opposition to the Motion. The Court heard the Motion on December

20, 2012 and took the matter under advisement.

The Plaintiffs filed a Memorandum in Support of their Motion for Summary

Judgment together with a Statement of Material Facts and exhibits, including 1) a

published decision issued by the United States District Court for the District of

Massachusetts, *see* Trenwick America Reinsurance Corp. v. IRC, Inc., 764 F. Supp. 2d 274

(D. Mass. 2011); 2) a Judgment entered by the District Court on May 23, 2011; 3) an

Amended Judgment entered by the District Court on July 1, 2011; and 4) portions of the

transcript of a deposition of the Debtor conducted on July 27, 2012.

The Debtor submitted a Memorandum in support of his Opposition, as well as a

Statement of Material Facts, portions of transcripts of depositions of Tracie Pancak

conducted on March 9, 2009 and August 2, 2012, portions of transcripts of depositions of

the Debtor conducted on September 17, 2008, January 13, 2009, January 14, 2009, and July

27, 2012, as well as several other exhibits.

The issue presented is whether the Plaintiffs are entitled to summary judgment

because the Debtor is collaterally estopped from contesting his liability under § 523(a)(6)

based upon the findings of fact and rulings of law set forth in the District Court's decision.

## II. BACKGROUND

The Debtor filed a voluntary Chapter 7 petition on November 11, 2011. On Schedule

F-Creditors Holding Unsecured Nonpriority Claims he listed only "Trenwick America

Reinsurance" and "Unum Life Insurance," each holding a claim in the sum of

$12,842,772.42.  On Schedules I and J-Current Income and Expenditures of Individual

Debtor(s), he disclosed that he was retired and had no monthly income and that his

monthly expenses totaled $17,923.00.  In his Statement of Financial Affairs, he disclosed the

following businesses in which he held interests:   NESIC Holdings, Inc., IRC-OHU

Management Company, Inc., IRC, Inc., and Sam Pooh LLC.

On February 10, 2012,  the Plaintiffs timely filed an adversary proceeding against

the Debtor seeking a declaration that the judgment entered by the United States District

Court for the District of Massachusetts was nondischargeable pursuant to 11 U.S.C. §

523(a)(6).  Specifically, they alleged:

> The District Court determined that Swasey, individually and through the
> two codefendants that he controlled, disavowed a reinsurance contract in
> bad faith, raised sham defenses, gave false and misleading testimony, and
> engaged in other outrageous pre- and post-litigation misconduct in a
> deliberate effort to frustrate Plaintiffs' contractual rights.

Plaintiffs' Complaint at ¶ 3.  The Plaintiffs added:

> The Court awarded Plaintiffs compensatory damages in the amount of
> $4,182,055.32, which amount was doubled in accordance with Chapter 93A,
> prejudgment interest of $1,643,033.15, and attorneys' fees and expenses of
> $2,661,013.83. As of November 11, 2011, the date of the filing of Swasey's
> Chapter 7 petition (the "Petition Date"), the sum of $11,476,251.93 remained
> due and owing, inclusive of post-judgment interest.

Id. at ¶ 4.

## III. THE DISTRICT COURT DECISION

On February 16, 2011, the United States District Court issued its decision in

Trenwick America Reinsurance Corp. v. IRC, Inc., 764 Fed. Supp. 2d 274 (D. Mass. 2011).

The Plaintiffs commenced their law suit on November 16, 2007, after making demand on

the Debtor and the other defendants in the district court action on November 5, 2007.

The Plaintiffs brought their action against Swasey, as well as companies that he

created and controlled, namely IRC, Inc. ("IRC, Inc.") and IRC Re, Limited ("IRC Re"), "for

3

fraud and breach of contract in connection with a managed workers' compensation insurance and employers['] liability insurance program known as Compcare 2000." Id. at 280. According to the District Court, the dispute centered on the Plaintiffs' claim that IRC Re and Swasey breached a reinsurance contract under which IRC Re was to provide retrocessional coverage for the Compcare 2000 program.[1] In 1996, the Debtor changed the direct insurer for the Compcare 2000 program such that Trenwick America Reinsurance Corp. was to provide reinsurance and retroceded 19% of the risk to IRC Re, a contract which was the subject of Plaintiffs' lawsuit. Id. at 281.

The District Court observed that, because IRC Re allegedly owed the Plaintiffs sums in excess of $4 million and IRC Re did not have the assets to cover the claimed losses, the Plaintiffs sought to pierce the corporate veil and recover those damages against IRC, Inc. and Swasey. In addition, the Plaintiffs sought damages and attorneys' fees under Mass. Gen. Laws ch. 93A against all the defendants, including Swasey, for "fraud, negligent misrepresentation, as well as for disavowing the contract in bad faith and engaging in a 'moving target' strategy of constantly shifting positions throughout this litigation." Id.

In addition to considering a number of outstanding motions, in particular Plaintiffs' motion in limine to identify adverse inferences to which the Plaintiffs maintained they were

---

[1] The Court presumes the parties are familiar with the underlying program and will not attempt to summarize the District Court's findings of fact as to the Compcare 2000 program and the specialized business of reinsurance.

4

entitled pursuant to a March 19, 2009 Sanctions Order,[2] the District Court described

procedural issues and defenses, "raised by the defendants at the last minute, ostensibly to

keep this Court from addressing the merits of the plaintiffs['] claim." Id. at 282.   It

observed:

> First, the defendants claimed for the first time at trial that Trenwick and
> UNUM were not proper parties. Rather, SARF [Special Accident Reinsurance
> Facility][3] was the proper party and since one of the SARF members was a
> Massachusetts corporation, there was no diversity. As I describe below, that
> claim was waived by the defendants because it was not raised in a timely
> fashion. Second, the defendants [claimed] that any contract between the
> parties required they arbitrate their claims. This claim was also waived
> because of timeliness.

Id. at 282.

> In summary, the District Court found the following:

>  I find that a contract did exist between IRC Re and the plaintiffs, and that the
> contract provided that 19% of the plaintiffs' risk was retroceded to IRC Re.
> I make this finding notwithstanding the statute of frauds, based on the
> extensive record before me. I further find that IRC Re cannot escape liability
> here by raising the defenses that Reliance raised against the initial parties,
> because the "follow the fortunes" or the "follow the settlements" doctrine

---

[2] The sanctions order was entered by Judge Young of the Unites States District
Court for the District of Massachusetts with respect to conduct during the course of
discovery.  764 F.3d at 304.  In its decision, the District Court refused to draw the
adverse inferences requested by the Plaintiffs pursuant to that order.  Id. at 304-05.

[3] According to the District Court, after Swasey changed the direct insurer of the
Compcare 200 program from Hanover Insurance Company to Reliance National
Insurance Company ("Reliance"), Reliance and Trenwick entered into a "Workers
Compensation Quota Share Reinsurance Agreement and Interests and Liabilities
Contract to the Quota Share Agreement"  whereby 54% of the risk insured by Reliance
was ceded to Trenwick and Trenwick in turn retroceded 100% of its risk to UNUM, the
fronting company of a reinsurance facility known as the Special Accident Reinsurance
Facility(" SARF").  764 F. Supp. 2d at 283.

applies to the case at bar. This doctrine does not allow a reinsurer to raise defenses that the reinsured has already decided to waive in good faith.

I decline to pierce the corporate veil with respect to the defendants' breach of contract claim against IRC Re; none of the factors for piercing are met in the case at bar.

And because I have found that a contract exists as between IRC Re and the defendants, a contract that has been breached, I do not have to address the other claims against IRC Inc. and Swasey that are predicated upon the failure to execute a written contract.

Nevertheless, neither Swasey nor IRC Inc. escape liability here. All of the defendants violated Chapter 93A in myriad ways. Swasey's conduct and that of the companies he created, controlled and administered, pre-, post- and during litigation *was simply outrageous, turning what should have been a routine claim against a reinsurer into a tortuous marathon*.

Id. at 282 (emphasis supplied).

The District Court determined that Swasey disavowed a contract and did so in bad faith.  Id. at 286.   The court found that evidence of the existence of a contract was "overwhelming" and that it shared the anger and frustration of a witness who was "indignant that Swasey and/or IRC Re had the audacity to claim that IRC Re did not take on risk in the program."  Id. at 287.  In addition, the District Court found the Debtor's testimony to be "wholly incredible," "internally contradictory and obviously false."  Id. at 290.  Indeed, the court found that "on more than one occasion at trial, Swasey *admitted* that he had given misleading or incorrect testimony during his deposition on key issues."  Id. (emphasis in orginal).  The court found that Swasey lied on a number of occasions and that his contentions as to the contract were "ludicrous."  Id. at 292.

In considering the defendants' claim that the Plaintiffs lacked standing to maintain

6

their contract claims against the defendants because any alleged contract would have been

between IRC Re and SARF, a claim the District Court determined the defendants had

waived, the court stated:

> I find that raising an objection to Trenwick and UNUM as the proper
> plaintiffs in this suit three years into the proceedings and on the eve of trial
> constitutes undue delay on defendants' part. They have waived their right
> to object.  (Indeed, this tactic is another version of raising the "no written
> contract" claim at the eleventh hour *to avoid repayment of an acknowledged debt*.
> It is a delaying tactic, putting off the day of reckoning.)

Id. at 294 (emphasis supplied).

With respect to the Plaintiffs' claims for fraud and negligent misrepresentation, the

District Court set forth the elements of proof required to establish fraud.  Finding no fraud

on the part of the defendants, the court stated:

> A plaintiff alleging fraud must show that (1) the defendant falsely
> represented or omitted a material fact, (2) with knowledge of the falsity, (3)
> with the purpose of inducing the plaintiffs to act, and (4) that the plaintiffs
> relied upon this representation to their detriment. In order to make out their
> fraud claim, plaintiffs would also need to demonstrate that defendants had
> an actual intent to deceive. While many of the findings of fact suggests [sic]
> that plaintiffs can probably satisfy the first (IRC Re ultimately breached the
> Contract despite promising to absorb 19% of the losses on the program),
> third (both Abraham and Luc stated that their companies would not have
> joined the program if IRC Re did not have "skin in the game"), and fourth
> (plaintiffs have had to incur the costs of IRC Re's unpaid balances and
> portion of the Trenwick/Reliance arbitration settlements as a result of joining
> the program and IRC Re's subsequent breach) elements of their fraud claim,
> *there is no evidence to suggest that Swasey, in his capacity as IRC Re or IRC, Inc.,*
> *knew that IRC Re ultimately intended to breach the contract at the time he invited*
> *representatives of Reliance and D & H to participate in the program.*
>
> While, as described above, I surely conclude that Swasey is not a trustworthy
> player or credible witness, the record suggests that he made the initial
> contract in good faith. . . .  There is no evidence that defendants made

representations to Luc that were known to be false or that "concealed true intentions," or that any of the defendants "never had any intention of reimbursing Plaintiffs for losses that would be ceded to MCIC/IRC Re."

To be sure, plaintiffs argue that the claim that defendants made false representations with "knowledge of the falsity," can also be satisfied by a "showing that the defendant made a statement with reckless disregard for its truth." . . . Nevertheless, I find that there is not enough evidence to show that defendants made a false representations [sic] "with knowledge of [their] falsity," under either standard. Thus, plaintiffs' fraud claim fails.

Id. at 301-02 (emphasis supplied, citations omitted).  The court also rejected the negligent misrepresentation claim, stating:

What likely happened was that Swasey hoped that the Reliance Compcare 2000 program continued to be successful enough so that IRC Re would not be liable for any significant losses; he did not intend for IRC Re to breach at the outset. He surely did not anticipate that IRC Re would become insolvent. It was not a lack of due care that caused him to promise Reliance and D & H that IRC Re would assume the 19% risk when it ultimately could not, but rather, *an optimistic outlook on the future of the program and his company*. Therefore, I find that there is not enough evidence to show that the ultimate harm to plaintiffs caused by Swasey and IRC Re's false statements was due to their failure to exercise due care, and thus plaintiffs' negligent misrepresentation claim also fails.

Id. at 302 (emphasis supplied).  The District Court also rejected the Plaintiffs' veil piercing claim under My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614 (1968), noting that the Plaintiffs relied upon a "confused intermingling of activity" theory rather than a "fraudulent or injurious consequence of the intercorporate relationship" theory.   764 F. Supp. 2d. at 303-04.

The District Court concluded its decision with an extensive discussion of the Plaintiffs' claims under Mass. Gen. Laws ch. 93A, § 2(a), which declares unlawful "unfair

methods of competition and unfair or deceptive acts or practices in the conduct of any

trade or commerce. . . ."   The court, while noting that causes of action for unfair and

deceptive acts are "notoriously amorphous," stated:

> It is well settled that "conduct in disregard of known contractual
> arrangements and intended to secure benefits for the breaching party
> constitutes an unfair act or practice" under Chapter 93A. While a breach of
> contract is not, on its own, sufficient to constitute a Chapter 93A violation, a
> breach of the implied covenant of good faith and fair dealing may be an
> unfair or deceptive practice under the statute. Moreover, in the reinsurance
> context, egregious misconduct that violates the duty of utmost good faith,
> goes beyond an ordinary breach of contract and may also give rise to liability
> under Chapter 93A.

Id. at 305 (citations omitted).  The court added: "[W]hile there is considerable debate about

whether litigation tactics alone can rise to the level of a Chapter 93A violation, there is little

doubt that a course of conduct beginning before litigation and continuing unabated,

thereafter may do so." Id. (citing Commercial Union Ins. Co. v. Seven Provinces Ins. Co.,

Ltd., 217 F.3d 33, 41 n.5 (1st Cir. 2000)).

The District Court made the following findings with respect to the Plaintiffs'

Chapter 93A claims:

> While the three defendants stand in different postures with respect to
> Chapter 93A, all participated in the culpable conduct. First, I find that IRC Re
> and its principal officer, Swasey, disavowed the Contract in bad faith, raised
> a specious defense, strung the plaintiffs along, pre-and post-litigation, all in
> a bad faith effort to avoid payment. Second, I find that Swasey exacerbated
> the situation by using IRC, Inc. to buttress IRC Re's arguments that there was
> no contract, that there was only an agreement to agree, that the absence of a
> formal written agreement was dispositive. With IRC, Inc., the program's
> manager, and IRC Re, the program's reinsurer, aligned on the same side, not
> surprisingly, Swasey's side, there was little chance of resolving the claim in
> a timely fashion and surely without litigation. And when the litigation

started, the defendants did everything they could to obfuscate the issues and
stall their ultimate resolution.

 . . . IRC Re's position that there was merely an agreement to agree was
nothing short of a sham, contrived at the eleventh hour to avoid paying. This
is more than the ordinary breach of contract. IRC Re's agent, Swasey, was the
architect of the entire arrangement. As I noted above, the witnesses who
testified on the behalf of the plaintiffs — even those without an interest in the
outcome — were positively indignant that IRC Re and Swasey had the
temerity to claim "no contract." I share that indignation. As such, I find that
IRC Re violated Chapter 93A.

 . . . As I noted at the outset, Swasey's fingerprints are all over this case — the
formation of the Reliance program, the company that administered it, the
company that reinsured it. *His* acts cannot be disentangled from IRC Re. I
find Swasey personally liable for the bad faith acts committed by IRC Re in
violation of 93A. Corporate officers may be held liable under Chapter 93A for
participating in unfair or deceptive practices of their corporations.

Since it was *Swasey* who assured Reliance and D & H that IRC Re would be
taking on 19% of the risk in the Compcare 2000 program, . . . and it was
*Swasey* who set up and renewed the Contract each year, and it was *Swasey*
who negotiated with Pencack about the amounts due until he directed Baird
to stop any further communication, . . . I find that he is individually liable for
the bad faith disavowal of the IRC Re contract under Chapter 93A. In
addition, Swasey's pre-litigation conduct was compounded by his
post-litigation antics, misrepresentations during his deposition, and even
during his testimony.

 . . . Plaintiffs allege that IRC, Inc. is also liable under 93A because IRC, Inc.
engaged in: (1) fraud and misrepresentation; (2) bad faith disavowal of the
retrocessional contract between IRC Re and Trenwick/UNUM; and (3)
"egregious" post-litigation misconduct. . . . While I found that neither IRC,
Inc. nor Swasey is liable for fraud or negligent misrepresentation, there can
be no liability under 93A relative to those allegations, but there are ample
other grounds for IRC, Inc.'s 93A liability.

Although disavowing a "known contractual arrangement" in bad faith in
order to secure benefits for the breaching party, constitutes an unfair act or
practice under 93A, the principle is complicated here because IRC, Inc. is not
a party to the Contract that was breached. Nevertheless, it was a central

player in the arrangement . . . . Since IRC Re's participation as a reinsurer was critical to the participation of the other parties, IRC Re's role allowed IRC, Inc. to earn over nine million dollars.

When IRC Re disavowed the contract, IRC, Inc., through Swasey, followed in lockstep, supporting a position that was untenable and in extreme bad faith. . . .

In addition, I will consider the litigation tactics of the defendants, insofar as those tactics continued the course of contact that had begun pre-litigation, the wholly bad faith disavowal of these contractual relationship [sic]. While there may be debate concerning whether litigation tactics alone can comprise a Chapter 93A violation, there is no debate concerning whether such tactics can be considered along with egregious, bad faith pre-litigation conduct.

There are cases in which the court has held that bringing a frivolous lawsuit can constitute a 93A violation. And there are cases in which a court has held that post litigation conduct continues a course of conduct which amounts to a 93A violation.

Id. at 305-07 (emphasis in original) (citations and footnote omitted). The court noted that

"'[i]t is settled law that conduct during litigation can constitute a 93A violation.'" Id. at 307

(quoting Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd., 217 F.3d at 41 n.5,

and Shubach v. Household Fin. Corp., 375 Mass. 133, 135–36, 376 N.E.2d 140 (1978) and

citing Refuse & Envtl. Sys., Inc. v. Indus. Servs. of Am., Inc., 932 F.2d 37, 43 (1st Cir. 1991)).

The District Court added:

While one might read "conduct during litigation" to encompass more than just the initial filing of a frivolous suit, the actual conduct found objectionable under 93A in Seven Provinces, began before the filing of the suit and continued throughout the litigation.

Id. at 307-08 (footnote omitted, citation omitted).

The Plaintiffs pointed to shifting positions throughout the litigation and discovery

11

abuses.  Addressing that issue, the court stated:

> Swasey, was fully aware that it was not participating in a good faith contract
> dispute, but rather was using its status as program manager and reinsurance
> intermediary in an effort to frustrate plaintiffs' contractual rights. Like IRC
> Re, it carried out defendants' moving target strategy of shifting positions,
> adopting the positions of its co-defendants, retaining the same lawyer,
> relying upon the same pleadings, and designating the same 30(b)(6) witness,
> Swasey.

Id. at 308.

> The District Court, citing Mass. Gen. Laws ch. 93A, § 11 concluded:

> I find that the acts described above are wilful [sic] and knowing. As such,
> plaintiffs are entitled to an award of double damages against IRC Re, IRC,
> Inc., and Swasey along with attorneys' fees and expenses in an amount to be
> determined by the Court upon plaintiffs' submission of an affidavit of
> services rendered on notice to counsel for defendants, and costs of suit. The
> measure of damages to be doubled is the amount owed by IRC Re, plus
> interest.

Id. at 311 (footnote omitted).

## IV. POSITIONS OF THE PARTIES

### A. The Plaintiffs

The Plaintiffs argue that the District Court's determinations are binding in this

proceeding under the doctrine of collateral estoppel.  They assert that they have satisfied

each and every element of collateral estoppel, adding "there is an identity of issues because

the essential elements of a § 523(a)(6) claim were litigated" in the context of the Chapter

93A count.  The Plaintiffs rely upon the District Court's determination that the Debtor's

misconduct was "willful and knowing" and entitled them to an award of double damages

under section 11 of Chapter 93A.  They also argue as follows:

12

> The District Court further found that the Debtor's willful misconduct was specifically intended to injure the Plaintiffs. The District Court found that "IRC Re and its principal officer, Swasey, disavowed the Contract in bad faith, raised a specious defense, strung the plaintiffs along, pre- and post-litigation, all in a bad faith effort to avoid payment." Id. at 305 (emphasis added). The District Court concluded that the Debtor's "position that there was merely an agreement to agree was nothing short of a sham, contrived at the eleventh hour to avoid paying." Id. at 306 (emphasis added). The District Court further found that "Swasey exacerbated the situation by using IRC, Inc. to buttress IRC Re's arguments that there was no contract, that there was only an agreement to agree, [and] that the absence of a formal written agreement was dispositive." Id. at 305. The District Court found that "IRC, Inc., through Swasey, was fully aware that it was not participating in a good faith contract dispute, but rather was using its status as program manager and reinsurance intermediary in an effort to frustrate plaintiffs' contractual rights." Id. at 308 (emphasis added).

Plaintiffs' Motion for Summary Judgment, Memorandum of Law at 17. The Plaintiffs conclude by arguing that the Debtor's misconduct, as found by the District Court, met the "willful" injury requirement of § 523(a)(6) because 1) the Debtor was not acting negligently or recklessly; and 2) the injury to the Plaintiffs was not simply an unintended consequence of a voluntary act. They state: "the Court found that the Debtor specifically intended to harm the Plaintiffs." Id. They also argue that the Debtor's conduct was without just cause and excuse and, therefore, met the malicious requirement of § 523(a)(6).

Because the Plaintiffs contend that all requirements for application of collateral estoppel have been satisfied, they conclude that they are entitled to summary judgment as a matter of law pursuant to Fed. R. Civ. P. 56(a), made applicable to this proceeding by Fed. R. Bankr. P. 7056.

B. <u>The Debtor</u>

The Debtor argues that his actions do not constitute a willful and malicious injury within the meaning of § 523(a)(6).  He references two attempts to amicably settle the matter without trial, the first time in January 2008, and the second time in May 2008, attaching copies of letters sent to the Plaintiffs' counsel.  In addition, the Debtor points to the District Court's determination that he did not engage in fraud.  Specifically, he points to the language where the Court indicated that there was no evidence that defendants made representations that were known to be false and no evidence of a lack of intent on the part of the defendants to reimburse the Plaintiffs.  *See* 764 F. Supp. 2d at 301.  In addition, the Debtor argues that he did not act maliciously, pointing to his settlement attempts and incarceration in an unrelated matter.

The Debtor attached to his Opposition deposition transcripts, including a transcript of one of his depositions which took place on January 13, 2009.  At deposition, he disclosed that he had been incarcerated since October 17, 2008 and was scheduled to be released on October 2, 2009.  As a result of his incarceration, the Debtor testified at a deposition that he had limited contact with personnel at IRC, Inc.  He also testified that his ability to make telephone calls was circumscribed by cost and a time limit of ten minutes.  He added that he was unable to receive telephone calls.  There was no evidence as to how these circumstances affected litigation strategy.

14

## V. DISCUSSION

A. <u>Applicable Law</u>

1. Collateral Estoppel

Two principles inform the Court's decision:

1) the doctrine of collateral estoppel applies in bankruptcy dischargeability proceedings, *see* <u>Backlund v. Stanley-Snow ( In re Stanley-Snow)</u>, 405 B.R. 11, 18 (B.A.P. 1st Cir. 2009) (citing <u>Grogan v. Garner</u>, 498 U.S. 279, 285 n.11 (1991)), *see also* <u>Grella v. Salem Five Cent Savs. Bank</u>, 42 F.3d 26, 30 (1st Cir. 1994); and

2) "the principle of collateral estoppel does not automatically operate to render a Chapter 93A judgment nondischargeable, because it would be possible under the same set of facts to find a violation of Chapter 93A for misconduct which lacks the elements of nondischargeability." <u>In re Stanley-Snow</u>, 405 B.R. at 22; *see also* <u>Harb v. Toscano (In re Toscano)</u>, 23 B.R. 736, 741 (Bankr. D. Mass. 1982) ("[D]espite the judge's lengthy findings on the Chapter 93A count, it is not clear whether the judge found sufficient proof of fraud or false representations to rise to the level of Section 523 fraud."); <u>Commonwealth v. Hale</u>, 618 F.2d 143 (1st Cir. 1980)). *See also* <u>Stoehr v. Mohamed</u>, 244 F.3d 206, 209 (1st Cir. 2001) ("[C]hapter 93A violations and fraud are not synonymous, and . . . chapter 93A liability may be premised on conduct other than fraud. The superior court's findings, however, make clear that fraud was in fact the basis for chapter 93A liability in this case, and do not suggest any different theory of chapter 93A liability.").

With respect to application of the doctrine of collateral estoppel to bar relitigation

of matters previously decided, the BAP stated:

In determining whether a party should be estopped from relitigating an issue decided in a prior state court action, the bankruptcy court must look to that state's law of collateral estoppel. *See* [<u>McCrory v. Spigel (In re]</u> <u>Spigel</u> [)], 260 F.3d [27] at 33 [(1st Cir. 2001)](citing <u>New Hampshire Motor Transp. Ass'n v. Town of Plaistow</u>, 67 F.3d 326, 328 (1st Cir. 1995)); *see also* <u>Marrese v. American Academy of Orthopaedic Surgeons</u>, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) (stating that the full faith and credit statute, 28 U.S.C. § 1738, "directs a federal court to refer to the preclusion law of the State in

which the judgment was rendered."). Under Massachusetts law, collateral estoppel precludes relitigation of issues in prior actions between the parties or those in privity with those parties, provided the issues were actually litigated in the first action, and determined by a "final judgment on the merits." Smith Barney, Inc. v. Strangie (In re Strangie), 192 F.3d 192, 194 (1st Cir. 1999). To apply the doctrine, a court must determine that: (1) there was a valid and final judgment on the merits in the prior adjudication; (2) the party against whom estoppel is asserted was a party (or in privity with a party) to the prior litigation; (3) the issue in the prior adjudication is identical to the issue in the current litigation; and (4) the issue in the prior litigation was essential to the earlier judgment. Alba v. Raytheon Co., 441 Mass. 836, 809 N.E.2d 516, 521 (2004) (citations omitted). The Supreme Judicial Court of Massachusetts has noted that "the 'guiding principle' in determining whether to allow a party to use collateral estoppel is whether the party against whom it is asserted had a 'full and fair opportunity to litigate the issue in the first action or [whether] other circumstances justify affording him an opportunity to relitigate the issue.' " Treglia v. MacDonald, 430 Mass. 237, 717 N.E.2d 249, 253 (1999) (quoting Martin v. Ring, 401 Mass. 59, 514 N.E.2d 663 (1987)).

Stanley-Snow, 405 B.R. at 18.

With respect to the instant matter, there can be no dispute that there was a valid and final judgment on the merits in the district court and that the party against whom estoppel is asserted was a party to the prior litigation.  Application of collateral estoppel hinges on whether the issue in the prior litigation is identical to the issue in the current litigation and whether the issue was essential to the earlier judgment.  In this regard, labels are not a prerequisite to application of collateral estoppel if it appears that the issue was considered in the prior acton.  See Rathsack v. Kozlik (In re Kozlik), No. 12-2659, 2013 WL 28708 at *2 (Bankr. E. D. Wis. 2013)(citing Ball v. A.O. Smith Corp., 451 F.3d 66, 70 (2d Cir. 2006), and Worldwide Prosthetic Supply, Inc. v. Mikulsky (In re Mikulsky), 301 B.R. 726, 729 (Bankr. E.D. Wis. 2003)).  The party asserting the doctrine has the burden of proving that all the

requirements have been met.  *See* <u>B.B. v. Bradley (In re Bradley)</u>, 466 B.R. 582, 586 (B.A.P.

1st Cir. 2012).  In the event collateral estoppel applies, the Plaintiffs will be entitled to

summary judgment as there will be no material facts in dispute.  *See*  Fed. R. Bankr. P.

56(a); <u>Desmond v. Varrasso (In re Varrasso)</u>, 37 F.3d 760 (1st Cir. 1994).[4]

---

[4] In <u>Desmond</u>, the First Circuit stated:

It is apodictic that summary judgment should be bestowed only when no genuine issue of material fact exists and the movant has successfully demonstrated an entitlement to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). As to issues on which the movant, at trial,  would be obliged to carry the burden of proof, he initially must proffer materials of evidentiary or quasi-evidentiary quality - say, affidavits or depositions-that support his position. *See* <u>Lopez v. Corporacion Azucarera de Puerto Rico</u>, 938 F.2d 1510, 1517 (1st Cir. 1991); <u>Bias v. Advantage Int'l, Inc.</u>, 905 F.2d 1558, 1560–61 (D.C. Cir.), *cert. denied*, 498 U.S. 958, 111 S.Ct. 387, 112 L.Ed.2d 397 (1990); *cf.* <u>Mendez v. Banco Popular de Puerto Rico</u>, 900 F.2d 4, 7 (1st Cir. 1990) ("The mere fact that plaintiff failed to file a timely opposition does not mean that defendant's Rule 56 motion should be granted"). When the summary judgment record is complete, all reasonable inferences from the facts must be drawn in the manner most favorable to the nonmovant. *See, e.g.*, <u>Morris v. Government Dev. Bank</u>, 27 F.3d 746, 748 (1st Cir. 1994); <u>Garside</u> [<u>v. Osco Frug, Inc.</u>], 895 F.2d [46] at 48 [(1st Cir. 1990)]; <u>Greenburg v. Puerto Rico Maritime Shipping Auth.</u>, 835 F.2d 932, 934 (1st Cir. 1987). This means, of course, that summary judgment is inappropriate if inferences are necessary for the judgment and those inferences are not mandated by the record. *See* <u>Blanchard v. Peerless Ins. Co.</u>, 958 F.2d 483, 488 (1st Cir. 1992) (warning that summary judgment is precluded "unless no reasonable trier of fact could draw any other inference from the 'totality of the circumstances' revealed by the undisputed evidence").

37 F.3d at 763 (footnote omitted).   Fed. R. Civ. P. 56 was amended effective December 1, 2010.  The summary judgment standard now appears in subsection (a) of Rule 56, rather than at subsection (c). The amended rule, however, does not change the standard for summary judgment. *See* <u>Farmers Ins. Exch. v. RNK, Inc.</u>, 632 F.3d 777, 782 n.4 (1st Cir. 2011).

2. Section 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt that results from "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).  In <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61-62 (1998), the Supreme Court held that § 523(a)(6) requires the actor to intend the injury, not just the act that leads to the injury.  Thus, recklessly or negligently inflicted injuries are not excepted from discharge under § 523(a)(6). <u>Geiger</u>, 523 U.S. at 64.

The United States Court of Appeals for the Seventh Circuit explained the willfulness prong of "willful and malicious injury" as follows:

> An injury is willful within the meaning of section 523(a)(6) only if intended; if it's the result but not the intended result of an intentional act, the debt arising from the injury is dischargeable, <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61–62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) ("nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury," <u>id.</u> at 61, 118 S.Ct. 974), even if the injury was the result of a reckless act. <u>Id.</u> at 61, 118 S.Ct. 974; <u>Maxfield v. Jennings</u>, 670 F.3d 1329, 1334 (11th Cir. 2012) (per curiam). Indeed, not even all intentional torts are covered. <u>Williams v. International Brotherhood of Electrical Workers Local 520</u>, 337 F.3d 504, 508 (5th Cir. 2003); <u>Miller v. J.D. Abrams Inc.</u>, 156 F.3d 598, 603–04 (5th Cir. 1998); <u>Wheeler v. Laudani</u>, 783 F.2d 610, 615 (6th Cir. 1986). Debts resulting from fraud, for example, are covered in different sections of the Bankruptcy Code. <u>Berkson v. Gulevsky</u>, 362 F.3d 961, 963–64 (7th Cir. 2004). And an intentional tort needn't involve an intent to cause injury. <u>Wheeler</u>, for example, involved a debt for libel, and libel can be committed by someone who believes, though negligently or even recklessly, that his libelous statement is privileged because it's true; such a debt is therefore dischargeable.

<u>Jendusa-Nicolai v. Larsen</u>, 677 F.3d 320, 322 (7th Cir. 2012).

18

The United States Court of Appeals for the Fifth Circuit, in reversing the district court which had affirmed the entry of summary judgment by the bankruptcy court in favor of a debtor who had attempted to obtain $1 million from two corporations by falsely claiming an ownership interest in them and threatening public exposure of their alleged illegal activity, elaborated on the "willfulness" requirement.  It observed:

> The district court held that Appellants could not establish a genuine issue of material fact as to willfulness, because they did not actually pay Shcolnik [the Debtor] the million dollars he demanded. The court interpreted the Supreme Court to require that a debtor intend "the alleged injury itself" in order to fulfill the willfulness component of 11 U.S.C. § 523(a)(6). <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). <u>Kawaauhau</u> held that a willful injury, in this context, is a "deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." 523 U.S. at 61, 118 S.Ct. at 977. Appellants have neither alleged nor offered evidence that Shcolnik intended to inflict litigation costs on them, which is the debt for which they urge nondischargeability.
>
> Unfortunately, the district court failed to consult this court's opinions interpreting <u>Kawaauhau</u>. First, we have held that an injury is "'willful and malicious' where there is either an *objective substantial certainty of harm or a subjective motive to cause harm*." <u>In re Miller</u>, 156 F.3d 598, 606 (5th Cir. 1998); <u>In re Williams</u>, 337 F.3d 504, 508–09 (5th Cir. 2003). Second, we noted that "it would seem peculiar to deem an action causing injury not 'willful' when the tortfeasor's action was in fact motivated by a desire to cause injury." <u>Miller</u>, 156 F.3d at 604. In an opinion nearly contemporaneous with <u>Miller</u>, this court stated that "'the debtor must have intended the actual injury that resulted.'" <u>State of Texas v. Walker</u>, 142 F.3d 813, 823 (5th Cir. 1998) (quoting <u>In re Delaney</u>, 97 F.3d 800, 802 (5th Cir. 1996)). This statement, however, arose in the course of distinguishing willful and malicious injury, as understood in <u>Kawaauhau</u>, from claims for breach of contract or conversion, neither of which "necessarily involves an intentional injury." <u>Id.</u>

<u>Shcolnik v. Rapid Settlements Ltd (In re Shcolnik)</u>, 670 F.3d 624 (5th Cir. 2012) (emphasis supplied).  *See also*  <u>Raspanti v. Keaty (In re Keaty)</u>, 397 F.3d 264 (5th Cir. 2005).  In <u>Keaty</u>,

the United States Court of Appeals for the Fifth Circuit held that a debt for sanctions

imposed because of the debtors' litigation tactics arose from willful and malicious injury

under § 523(a)(6). It determined that the debtors' intended injury was "harassment"

through baseless litigation, as their actions were "substantially certain to . . . cause . . .

financial injury." Id. at 274.  The Fifth Circuit noted that the state court had found that the

Keatys knew their "exceptions of res judicata and prescription had no merit," that their

answers to Raspanti's request for admissions were disingenuous, and that "the proceedings

by the Keatys were knowingly without foundation, crafted for the purposes of harassment,

and designed to prolong the proceedings deliberately and needlessly and was sanctionable

under Louisiana law." Id. at 268 (footnote omitted). *But see* Ormsby v. First Am. Title Co.

of Nevada (In re Ormsby), 591 F.3d 1199, 1206 (9th Cir. 2010) ("In this Circuit, ' § 523(a)(6)'s

willful injury requirement is met only when the debtor has a subjective motive to inflict

injury or when the debtor believes that injury is substantially certain to result from his own

conduct.'") (citing Carrillo v. Su (In re Su), 290 F.3d 1140 (9th Cir. 2002)).

> In In re Su, the Ninth Circuit observed:
>
> The question we must decide is the state of mind that is required to satisfy
> § 523(a)(6)' s willful injury requirement. According to the Restatement, an
> action is intentional if an actor subjectively "desires to cause consequences
> of his act, or . . . believes that the consequences are substantially certain to
> result from it." RESTATEMENT (SECOND) OF TORTS § 8A (1964). The Geiger
> Court, however, did not expressly adopt this subjective Restatement
> formulation, and the lower courts have differed over whether to adopt a
> strict subjective test when applying § 523(a)(6).

Su, 290 F.3d at 1143 (footnote omitted).  The court explored the split of authority existing

between the Fifth and Sixth circuits.  It stated:

> The Sixth Circuit's interpretation of § 523(a)(6) exemplifies the strict subjective approach, in which a debt is nondischargeable under § 523(a)(6) only if the debtor intended to cause harm or knew that harm was a substantially certain consequence of his or her behavior. In Markowitz v. Campbell (In re Markowitz), 190 F.3d 455 (6th Cir. 1999), the debt arose from a legal malpractice action against the debtor. The creditor argued that the debt was nondischargeable under § 523(a)(6)'s "willful and malicious injury" provision. While In re Markowitz acknowledged that Geiger had not expressly adopted the Restatement's subjective "substantially certain" language, it nonetheless concluded that "from the Court's language and analysis in Geiger, we now hold that unless 'the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." Id. at 464 (quoting RESTATEMENT (SECOND) OF TORTS § 8A (1964)).
>
> Conversely, the Fifth Circuit's interpretation of § 523(a)(6) exemplifies the objective approach, in which debt is nondischargeable under § 523(a)(6) either if there is a subjective intent to cause an injury or if there is an objective substantial certainty of harm. In In re Miller, the creditor sought a determination that a state court judgment for misuse of trade secrets constituted a nondischargeable debt. While acknowledging that Geiger "certainly eliminates the possibility that 'willful' encompasses negligence or recklessness," In re Miller held that "the label 'intentional tort' is too elusive to sort intentional acts that lead to injury from acts intended to cause injury. Rather, either objective substantial certainty or subjective motive meets the Supreme Court's definition of 'willful . . . injury' in § 523(a)(6)." 156 F.3d at 603.

Su, 290 F.3d at 1143-44.  The court recognized that it had failed to distinguish between the

objective and subjective standards, stating:

> This court too committed a similar oversight when it examined, for the first time, the question of intent in the context of § 523(a)(6)'s willful injury requirement. In In re Jercich [Petralia v. Jercich (In re Jercich), 238 F.3d 1202 (9th Cir. 2001)], a creditor who had obtained a state court judgment for unpaid wages against his former employer, a Chapter 7 debtor, sought to except that judgment debt from discharge pursuant to § 523(a)(6). Focusing

on the subjective intent of the employer, this court held "that under <u>Geiger</u>, the willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury or that the debtor believed that injury was substantially certain to occur as a result of his conduct." 238 F.3d at 1208. Given that the employer in <u>In re Jercich</u> knew both that he owed wages to his employee and that his failure to pay those wages would, with substantial certainty, harm his employee, this court concluded that the debt owed the employee was nondischargeable under § 523(a)(6). <u>Id.</u> at 1208–09.

The holding in <u>In re Jercich</u> is clear: § 523(a)(6) renders debt nondischargeable when there is either a subjective intent to harm, or a subjective belief that harm is substantially certain. Unfortunately, however, the opinion also states that the subjective inquiry it endorsed is "consistent with the approaches taken by the Fifth and Sixth Circuits," in <u>In re Miller</u> and <u>In re Markowitz</u>. <u>Id.</u> We believe that this claim of consistency is not completely accurate. Nonetheless, Carrillo seizes on this misstatement to rationalize the bankruptcy court's heavy reliance on <u>In re Miller</u>. Carrillo's argument fails, however, because the holding of <u>In re Jercich</u>, which sets out the scope of § 523(a)(6)'s willful injury requirement, expressly articulates only a subjective dimension. Because the bankruptcy court focused exclusively on the objective substantial certainty of harm stemming from Su's driving, but did not consider Su's subjective intent to cause harm or knowledge that harm was substantially certain, we agree with the BAP that the bankruptcy court applied the incorrect legal standard. Thus, this proceeding must be remanded to the bankruptcy court for consideration of Carrillo's nondischargeability claim under the subjective framework articulated in <u>In re Jercich</u>.

<u>Su</u>, 290 F.3d at 1144-45 (footnote omitted).   In a footnote, the court observed that "[t]he objective test is broader than the subjective one, allowing nondischargeability either with subjective intent/knowledge or with objective substantial certainty." <u>Id.</u> at 1445 n.3.

The Ninth Circuit, in rejecting the objective approach, explained that "failure to adhere strictly to the limitation expressly laid down by <u>In re Jercich</u> will expand the scope of nondischargeable debt under § 523(a)(6) far beyond what Congress intended." <u>Id.</u> at

1145.  It added:

> By its very terms, the objective standard disregards the particular debtor's
> state of mind and considers whether an objective, reasonable person would
> have known that the actions in question were substantially certain to injure
> the creditor. In its application, this standard looks very much like the
> "reckless disregard" standard used in negligence. That the Bankruptcy
> Code's legislative history makes it clear that Congress did not intend §
> 523(a)(6)'s willful injury requirement to be applied so as to render
> nondischargeable any debt incurred by reckless behavior, reinforces
> application of the subjective standard. The subjective standard correctly
> focuses on the debtor' state of mind and precludes application of § 523(a)(6)'s
> nondischargeability provision short of the debtor's actual knowledge that
> harm to the creditor was substantially certain.

Id. at 1145-46 (footnotes omitted).  Because a debtor is unlikely to testify that he or she

intended an injury to another, the Ninth Circuit observed:

> In addition to what a debtor may admit to knowing, the bankruptcy court
> may consider circumstantial evidence that tends to establish what the debtor
> must have actually known when taking the injury-producing action. See, e.g.,
> Spokane Ry. Credit Union v. Endicott (In re Endicott), 254 B.R. 471, 477 n.9
> (Bankr. D. Idaho 2000) ("The use of the term 'objective' is not talismanic nor
> at odds with Geiger if it is viewed as simply recognizing that a debtor will
> have to deal with any direct or circumstantial evidence which would indicate
> that he must have had a substantially certain belief that his act would injure,
> notwithstanding any subjective denial of such knowledge."). This approach,
> however, remains fundamentally subjective in that it retains its focus on
> what was actually going through the mind of the debtor at the time he acted.

Id. at 1146 n.6.  See also Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart), 229 F.3d

1163, 2000 WL 1275614 (10th Cir. 2000) (Table).[5]

---

[5] The Tenth Circuit stated:

> The error in this line of authority ultimately derives from the tacit premise
> that the only alternative to subjective desire is objective substantial
> certainty, see Miller, 156 F.3d at 605 (assuming subjective standard equates
> with "evil motive," requiring use of objective standard to distinguish

In the First Circuit, many courts, including this Court, have adopted the objective

test without recognizing the split of authority among several circuits, frequently citing

McAlister v. Slosberg (In re Slosberg), 225 B.R. 9 (Bankr. D. Me. 1998).  The United States

Court of Appeals for the First Circuit, however, has not addressed whether the

"substantially certain to result in injury component" of "willful" must be satisfied using

an objective or a subjective standard.

The court in Slosberg stated:

The "substantially certain" alternative is a prominent aspect of the *Restatement* section the Court embraces. *See Restatement (Second) of Torts*, supra, § 8A. It is an ingredient of the text of § 8A and comment b., as well as the first illustration. Although the Court did not cite comment b., it could be of some significance to future applications of § 523(a)(6). It reads:

---

substantial certainty). This assumption denies the purely subjective dichotomy of desire/belief actually set out in § 8A, and ignores the history of intent jurisprudence encapsulated in the pertinent illustration to that section. *See* Illustration 1 to § 8A ("A has no desire to injure C, but knows that his act is substantially certain to do so. C is injured by [A's act]. A is subject to liability to C for an intentional tort."). Miller fails to appreciate that the notion of subjective substantial certainty extends the scope of intent well beyond the compass of evil motive, without extending it to so far as to include consequences entirely outside the actor's ken, which would be contrary to the whole thrust of the Supreme Court's decision in Geiger.

In sum, the "willful and malicious injury" exception to dischargeability in § 523(a)(6) turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur. When injury was "neither desired nor in fact anticipated by the debtor," it is outside the scope of the statute. Geiger, 523 U.S. at 62.

Id. at *3.

> All consequences which the actor desires to bring about are
> intended, as the word is used in this Restatement. Intent is not,
> however, limited to consequences which are desired. If the
> actor knows that the consequences are certain, or substantially
> certain, to result from his act, and still goes ahead, he is treated
> by the law as if he had in fact desired to produce the result. As
> the probability that the consequences will follow decreases,
> and becomes less than substantial certainty, the actor's conduct
> loses the character of intent, and becomes mere recklessness. .
> . . As the probability decreases further, and amounts only to a
> risk that the result will follow, it becomes ordinary negligence.
> . . . All three have their important place in the law of torts, but
> the liability attached to them will differ.

Id. cmt. b. The first illustration offers practical guidance as to how this
standard might factually appear:

> A throws a bomb into B's office for the purpose of killing B. A
> knows that C, B's stenographer, is in the office. A has no desire
> to injure C, but knows that his act is substantially certain to do
> so. C is injured by the explosion. A is subject to liability to C for
> an intentional tort.

Id. illus. 1.

The actor's *subjective* knowledge that the injury is certain or substantially
certain to occur distinguishes this articulation of willful from articulations of
implied malice that turn on whether the actor should objectively appreciate
the danger his conduct creates. Thus, a debtor who intentionally acts in a
manner he knows, or is substantially certain, will harm another may be
considered to have intended the harm and, therefore, to have acted willfully
within the meaning of § 523(a)(6).

Slosberg, 225 B.R. at 19 (footnote omitted).[6] *See, e.g.,* B.B. v. Bradley (In re Bradley), 466 B.R.

---

[6] The court in Slosberg correctly observed that the First Circuit's articulation of
willfulness in In re Printy had been overruled by Geiger. 225 B.R. at 18. It also noted:
"The First Circuit has decided one § 523(a)(6) case since In re Geiger. In Roumeliotis v.
Popa (In re Popa), 140 F.3d 317 (1st Cir.1998) the court summarily concluded that an
employer/debtor's failure to obtain workers' compensation insurance (which left the
creditor without such coverage when he was injured on the job), although intentional,

582, 587 (B.A.P. 1st Cir. 2012);[7] Liddell v. Peckham (In re Peckham), 442 B.R. 62 (Bankr. D.

Mass. 2010);[8] Bauer v. Colokathis (In re Colokathis), 417 B.R. 150, 159 (Bankr. D. Mass.

2009) (plaintiff had the burden of showing that the debtor either subjectively intended to

cause the injury or that, objectively, the debtor knew that her actions would be

"substantially certain to cause injury");[9] Caci v. McDonald (In re Brink), 333 B.R. 560, 567

(Bankr. D. Mass. 2005);[10] Gomes v. Limieux (In re Limieux), 306 B.R. 433, 440 (Bankr. D.

Mass. 2004);[11] Read & Lundy, Inc. v. Brier (In re Brier), 274 B.R. 37, 44 (Bankr. D. Mass.

2002).[12] See also Doherty v. Coccia (In re Coccia), 351 B.R. 17, 20  (Bankr. D. R.I. 2006)

---

was not "willful" because he did not act with an intention to cause injury. Id. at 19
(citing 140 F.3d. at 318).

[7] Debt arising from state court judgment entered against Chapter 7 debtor on
"intentional infliction of emotional distress" claim was not entitled to collateral estoppel
effect as there was no indication that the judgment was based on theory that debtor had
intended to cause emotional distress to creditor or had acted in reckless disregard of
probability of causing such distress.

[8] Creditor failed to prove contempt sanction was willful where debtor suffered
from depression and ignored state court orders.

[9] Debtor acted with intent to injure as a result of unauthorized use of plaintiff's
social security number and date of birth to obtain credit and service where debtor was
convicted of wire fraud and aggravated identity theft.

[10] Debtors acted with intent to injure property when they trespassed and cut
down tress located on their neighbor's property with knowledge that they did not have
permission to do so.

[11] Debtor acted willfully and maliciously as a result of jury finding that the
debtor committed the intentional tort of assault and battery.

[12] Debtor collaterally estopped from relitigating state court award of punitive
damages for violating Rhode Island Trade Secrets Act, which permitted such damages

(debtor did not act willfully and maliciously when towing and storing impounded vehicle which sustained damage); <u>M-R Sullivan Mfg. Co., Inc. v. Sullivan (In re Sullivan)</u>, 238 B.R. 230, 238 (Bankr. D. Mass. 1999) (transfer of patent rights not willful and malicious where debtor had good faith belief he owned the patent). Although this Court has adopted the objective standard for willfulness, it has entered judgments in favor of debtors where the alleged willful and malicious injury arises out of breach of construction contracts due to the absence of evidence of willful and malicious conduct. *See* <u>LaLonde v. Henricksen (In re Henricksen)</u>, No. 11-1150, 2011 WL 6301041 (Bankr. D. Mass. Dec. 16, 2011); <u>Zhao v. Lauzon (In re Lauzon)</u>, No. 10-1114, 2012 WL 1192800 (Bankr. D. Mass. April 9, 2012); or breach of an insurance agreement, *see* <u>Breed's Hill Ins. Agency, Inc. v. Fravel (In re Fravel)</u>, No. 10-1192, __ B.R. __, 2013 WL 28695 (Bankr. D. Mass. Jan. 2, 2013).

Although the bankruptcy courts in the First Circuit have adopted the objective standard articulated by the court in <u>Slosberg</u>, they have done so without explicit consideration of the alternative subjective approach adopted by the Ninth and Tenth Circuits. Nevertheless, according to the court in <u>Hermosilla v. Hermosilla (In re Hermosilla)</u>, 430 B.R. 13 (Bankr. D. Mass. 2010), "a vast majority of courts, citing <u>Geiger</u>'s reliance on the Restatement, hold that injuries resulting from intentional acts known by the debtor to be 'substantially certain to cause injury' are nondischargeable, regardless of

---

for "willful and malicious appropriation," where state court complaint contained counts for intentional torts, including misappropriation of trade secrets and tortious interference with contractual relations.

whether the debtor had a subjective intent to cause any injury at all." Id. at 23-24.[13]

In Stewart Tilghman Fox & Bianchi, P.A. v. Kane (In re Kane), 470 B.R. 902 (Bankr.

S.D. Fla. 2012), the court also noted that "[n]umerous decisions support the conclusion that

where injury is a substantial certainty a debtor's intentional act may result in a

non-dischargeable obligation under section 523(a)(6). Id. at 941 (citing Markowitz v.

Campbell (In re Markowitz), 190 F.3d 455 (6th Cir. 1999); Miller v. J.D. Abrams Inc. (In re

Miller), 156 F.3d 598, 603 (5th Cir. 1998); Baldwin v. Kilpatrick (In re Baldwin), 245 B.R. 131

---

[13] The court cited Bauer v. Colokathis (In re Colokathis), 417 B.R. 150, 158 (Bankr.
D. Mass. 2009); Greene v. Mullarkey (In re Mullarkey), 410 B.R. 338, 355 n.16 (Bankr. D.
Mass. 2009); Cassella Waste Mgt. v. Romano (In re Romano), 385 B.R. 12, 30 (Bankr. D.
Mass. 2008); Massod v. Fayad (In re Fayad), No. 01–1062, 2008 WL 160647 *2 (Bankr. D.
Mass. Jan. 5, 2008); McGarry v. Chew (In re Chew), No. 06–1039, 2007 WL 1876457 *2
(Bankr. D. Mass. Jun. 27, 2007); Beland v. Cunningham (In re Cunningham), 365 B.R.
352, 363 (Bankr. D. Mass. 2007); Alliguie v. Power Innovators, Inc. (In re Boward), No.
03–1520, 2007 WL 3010538 *4 (Bankr. D. Mass. Oct. 9, 2007); DCFS Trust v. Goldstein (In
re Goldstein), 345 B.R. 412, 423 (Bankr. D. Mass. 2006); Burke v. Neronha (In re
Neronha), 344 B.R. 229, 231 (Bankr. D. Mass. 2006); Caci v. McDonald (In re Brink), 333
B.R. 560, 567 (Bankr. D. Mass. 2005); Gomes v. Limieux (In re Limieux), 306 B.R. 433, 440
(Bankr. D. Mass. 2004); Read & Lundy, Inc. v. Brier (In re Brier), 274 B.R. 37, 44 (Bankr.
D. Mass. 2002); and Beaupre v. Smith (In re Smith), 270 B.R. 544, 549 (Bankr. D. Mass.
2001). The court also cited Berry v. Vollbracht (In re Vollbracht), 276 Fed. App'x. 360,
361 (5th Cir. 2007).  In re Granoff, 250 Fed.Appx. 494 (3d Cir. 2007); Markowitz v.
Campbell (In re Markowitz), 190 F.3d 455, 461 (6th Cir. 1999); Thornton v. City of
Philadelphia, No. 04–2536, 2005 WL 2716484 *4 (E.D. Pa. Oct. 20, 2005); Mattson v.
Hawkins (In re Hawkins), 231 B.R. 222, 228 (D. N.J. 1999); Schweitzer v. Kartman (In re
Kartman), 391 B.R. 281, 284 (Bankr. W.D.  Pa. 2008); McCann v. Jacques, No. 06–1069,
2007 WL 1420590 *2 (Bankr. D. N.J. 2007); Doherty v. Coccia (In re Coccia), 351 B.R. 17,
20 (Bankr. D. R.I. 2006); Ready Productions, Inc. v. Jarvis (In re Jarvis), No., 2005 WL
1941639 * 3 (Bankr. D. N.H. Aug. 12, 2005); McAlister v. Slosberg (In re Slosberg), 225
B.R. 9, 21 (Bankr. D. Me. 1998);  and Worster v. Howcroft (In re Howcroft), 223 B.R. 845,
847 (Bankr. D. N.H. 1998).

(B.A.P. 9th Cir. 2000); <u>Via Christi Reg'l Med. Ctr. v. Budig (In re Budig)</u>, 240 B.R. 397, 401

(D. Kan. 1999); <u>Fid. Fin. Servs. v. Cox (In re Cox)</u>, 243 B.R. 713 (Bankr. N.D. Ill. 2000); <u>Avco</u>

<u>Fin. Servs. v. Kidd (In re Kidd)</u>, 219 B.R. 278, 285 (Bankr. D. Mont. 1998)).  The court in

<u>Kane</u>, however, also recognized that

> [t]here is some disagreement among the courts as to whether the substantial
> certainty standard is a subjective standard, requiring the plaintiff to prove
> that the defendant knew the act was substantially certain to cause injury, or
> an objective standard, requiring the plaintiff to show that the defendant's act
> was substantially certain to cause injury without regard to the defendant's
> actual belief or knowledge in this regard.

470 B.R. at 941.  The court concluded:

> Where proof of the defendant's knowledge with regard to substantial
> certainty is required, the defendant is unlikely to admit that he or she acted
> with actual knowledge an injury would result. "In addition to what a debtor
> may admit to knowing, the bankruptcy court may consider circumstantial
> evidence that tends to establish what the debtor must have actually known
> when taking the injury-producing action." <u>Carrillo v. Su (In Re Su)</u>, 290 F.3d
> 1140, 1146 n.6 (9th Cir. 2002). "The Debtor is charged with the knowledge of
> the natural consequences of his actions." <u>Ormsby v. First Am. Title Co. of
> Nev. (In re Ormsby)</u>, 591 F.3d 1199, 1206 (9th Cir. 2010) (citing <u>Cablevision
> Sys. Corp. v. Cohen (In re Cohen)</u>, 121 B.R. 267, 271 (Bankr. E.D.N.Y. 1990)).

> Most of the decisions addressing the nature of the substantial certainty
> analysis involve financial harm similar to that presented here. *See, e.g.*, <u>In re
> Englehart</u>, 2000 WL 1275614, 2000 U.S. App. LEXIS 22754; <u>Greentree Fin.
> Servs. v. Howard (In re Howard)</u>, 261 B.R. 513, 521 (Bankr. M.D. Fla. 2001).
> In these cases, the plaintiff typically alleges that the defendant misapplied or
> withheld funds or other property, interfered with contractual relations, or the
> like. In financial tort cases, because of the somewhat attenuated relationship
> between the defendant's act and the resulting harm, a purely objective
> substantial certainty analysis would bring the court dangerously close to the
> recklessness standard decried in <u>Kawaauhau</u>. In such cases, using a
> subjective standard for substantial certainty avoids this risk. For this reason,
> the Court applies the subjective standard in the present case.

470 B.R. at 941-42 (footnote omitted).[14]

Application of the willful and malicious standards applicable to § 523(a)(6), as evident from the discussion above, is challenging in circumstances where a plaintiff seeks to use collateral estoppel, especially when the injuries are financial and the court whose judgment the plaintiff seeks to enforce has not made specific findings as to the debtor's intent to injure. In Liddell v. Peckham (In re Peckham), 442 B.R. 62 (Bankr. D. Mass. 2010), this Court considered whether the debtor willfully and maliciously injured the plaintiff by failing to respond to discovery in aid of execution of the plaintiff's judgment and subjecting himself to contempt and civil arrest. The Court concluded that "[t]he case law is fact driven, and the holdings in the decisions . . . often are the result of both egregious and affirmative misconduct by debtors in contravention of court orders or injunctions. . . ." 442 B.R. at 84. In Peckham, the Court discussed several cases involving contempt penalties alleged to constitute willful and malicious injuries. See, e.g, Musilli v. Droomers (In re Musilli), 379 Fed. App'x 494 (6th Cir. 2010); Siemer v. Nangle (In re Nangle), 274 F.3d 481, 484 (8th Cir.2001). For example, in Karl v. Stalnaker (In re Stalnaker), 408 B.R. 440 (Bankr.

---

[14] In a footnote, the court in Kane observed that "Courts have struggled far less with physical intentional torts." 470 B.R. at 942 n.11 (citing Pettey v. Belanger, 232 B.R. 543 (D. Mass. 1999); Drewes v. Levin (In re Levin), 434 B.R. 910 (Bankr. S.D. Fla. 2010); Kleman v. Taylor (In re Taylor), 322 B.R. 306, 309 (Bankr. N.D. Ohio 2004); Montgomery v. Herring (In re Herring), 193 B.R. 344, 352 (Bankr. N.D. Ala. 1995). The court added: "In such cases, the circumstantial evidence of the defendant's actual knowledge or belief tends to merge with the evidence supporting a finding of substantial certainty on an objective basis. To put it plainly, the willfulness of the act under section 523(a)(6) is often fairly obvious given the circumstances."

M.D. Ga. 2009), the court stated:

> While Plaintiff has failed to establish all the elements of collateral estoppel based on the judgment of tortious interference with a bequest, the attorney fees are a separate matter. In West Virginia, they are subject to an independent legal standard. The court may award attorney fees to a prevailing party if the losing party "'has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Yost v. Fuscaldo, 185 W.Va. 493, 408 S.E.2d 72, 78 (1991) (quoting Nelson v. Public Employees Ins. Bd., 171 W.Va. 445, 300 S.E.2d 86, 92 (1982)). The rule is concerned with conduct leading to or in connection with the legal proceedings. Id. at 79. It serves as a means to discourage "[p]arties whose interest in the legal process is to oppress or cheat others[.]" Id. In other words, it applies to a party who intends to cause harm through the wrongful use of the legal process. As such, it requires a finding equivalent to willful and malicious injury. In this case, after a hearing on the question of attorney fees, the trial court made specific findings that "Defendant, Edith Stalnaker's conduct in this matter was in bad faith, willful, wanton, and vexatious[.]" Based on this standard, the Court is persuaded that the trial court was required to find and did find that Debtor willfully and maliciously injured Plaintiff during the course of the state court proceedings. Therefore, the attorney fees are a debt arising from willful and malicious injury, and Plaintiff is entitled to summary judgment based on collateral estoppel as to the attorney fees only.

Id. at 448. Similarly, in O'Melveny & Meyers v. Hopkins (In re Hopkins), 201 F.3d 448,

1999 WL 1243253 (10th Cir. 1999) (Table), the Tenth Circuit sated:

> Before defendant filed for relief under the Bankruptcy Code, a California court entered sanctions against defendant, finding that he had violated California law by engaging in bad faith litigation tactics in representing a client who was ultimately found to be a vexatious litigant. When defendant sought to have the sanction debts discharged in bankruptcy, the bankruptcy court held that the sanctions were nondischargeable under § 523(a)(6) because the sanctions were the result of willful and malicious injury by defendant. The bankruptcy and district courts found that defendant was collaterally estopped from denying nondischargeability of the debt because the California court findings, establishing that defendant engaged in sanctionable bad faith conduct, were equivalent to findings that defendant wilfully and maliciously injured plaintiffs within the meaning of § 523(a)(6).

31

In its decision, the district court carefully considered the California court sanction orders, California law on bad faith, and federal law relating to willful and malicious conduct under § 523(a)(6). The court correctly found that the sanction orders contained particular and specific findings establishing willful and malicious conduct under § 523(a)(6). We agree with the district court that there may be cases in which a finding of bad faith litigation tactics under California law would not be the equivalent of finding willful and malicious conduct for purposes of § 523(a)(6), but in this particular case the findings in the two sanction orders are such that defendant is collaterally estopped from arguing that he did not willfully and maliciously injure the plaintiffs. The district court's memorandum decision is thorough and well-reasoned, and any legal analysis we could offer would be redundant.

Id. at *1.

Notably, the decisions in Stalnaker and Hopkins are distinguishable from the instant case in that the judgment entered against the Debtor was not one for sanctions, and the legal fees were a component of the Ch. 93A, § 11 violation, not a separate award.  In the district court litigation, Judge Young considered sanctioning the Debtor for discovery abuses but the District Court in its decision denied the Plaintiffs' motion in limine to identify adverse inferences to which they were entitled pursuant to the March 19, 2009 sanctions order, as well as a motion in limine to preclude certain expert testimony.  764 F. Supp. 2d at 281 n.2.

B. Analysis

In awarding damages, the District Court in Trenwick Am. Reinsurance Corp. v. IRC, Inc., 764 F. Supp. 2d 274 (D. Mass. 2011), did not distinguish between the Debtor's bad faith conduct in disavowing the contract and his outrageous conduct during the trial, where he gave, in the court's words, obviously false testimony that was both preposterous and

32

ludicrous, and which obviously would have increased the Plaintiffs' legal fees.   In

discussing the Plaintiffs' negligent misrepresentation claims, the court theorized  "that

Swasey hoped that the Reliance Compcare 2000 program continued to be successful

enough so that IRC Re would not be liable for any significant losses," adding that "he did

not intend for IRC Re to breach at the outset . . . [and] . . . surely did not anticipate that IRC

Re would become insolvent." <u>Id.</u> at 302.  In addition, she ascribed to the Debtor a motive

of avoiding repayment of an acknowledged debt.  <u>Id.</u> at 294.  Nevertheless, in discussing

the Plaintiffs' Chapter 93A claims against the defendants, the court determined that

"egregious misconduct that violates the duty of utmost good faith, goes beyond an

ordinary breach of contract and may give rise to liability under Chapter 93A," while noting

the existence of "considerable debate about whether litigation tactics alone can rise to the

level of a Chapter 93A violation" and adding that "there is little doubt that a course of

conduct beginning *before* litigation and continuing unabated, thereafter may do so." <u>Id.</u> at

305 (emphasis in original).

In the context of § 523(a)(6)'s  requirement of an intent to injure, the District Court

did not expressly state that the Debtor intended to injure the Plaintiffs, despite their present

contention that it did.  In other words, there is no direct or indirect ruling in the District

Court's opinion that would permit this Court to find that the Debtor subjectively intended

to injure the Plaintiffs or that he  subjectively was aware that injury was substantially

certain to occur.  Thus, this Court must determine objectively whether his conduct was

substantially certain to cause harm based on the District Court's findings or whether the

Debtor could have acted recklessly in defending the Plaintiffs' collection action.

The District Court found a bad faith disavowal of the contract and a "specious defense" with the bad faith purpose of avoiding payment.  Id.  The court determined that when the litigation started, Swasey and the other defendants "did everything they could to obfuscate the issues and stall their ultimate resolution." Id.  Moreover, the court found the Debtor's conduct to be "willful and knowing" for purposes of Chapter 93A's provision for doubling damages and awarding attorneys' fees.

An understanding of the "willfully and knowing" standard under Chapter 93A sheds light on § 523(a)(6)'s "willful" requirement.  According to one commentator,

> A willful or knowing violation is probably defined as the intention or knowledge of causing an unfair or deceptive result.  *A willful violation includes a reckless violation*.  A negligent violation is not a willful or knowing violation.  In order to support an ward of multiple damages the willful or knowing conduct must be causally connected to the claimed loss.

52 Michael C. Gilleran, *Law of Chapter 93A*, Mass. Practice Series, § 11.9 (2011) (emphasis supplied).  Furthermore,

> A willful state of mind for purposes of 93A exists where the defendant acts either with the intention, or with the conscious objective, of engaging in unfair or deceptive conduct or of causing an unfair or deceptive result. The required mental state must be, either intentionally or with a conscious objective, not only to do the acts complained of but also that those acts be unfair or deceptive. The mere mental state of acting intentionally or with a conscious objective to do the acts complained of, without an intention also to do unfair or deceptive acts, will not be sufficient to establish a willful or knowing violation. If mere intention or conscious objective to do the acts complained of were sufficient, then in every 93A violation where the acts themselves were committed intentionally or with a conscious objective, as opposed to involuntarily or accidentally, and without a further showing of intention or conscious objective that the acts also be unfair or deceptive, a

willful or knowing 93A violation would have to be found.

A knowing state of mind for purposes of 93A exists where the defendant is aware that his conduct is unfair or deceptive of is practically certain that his conduct will cause an unfair or deceptive result. Again, the mental state of acting knowingly is above and beyond the mental state of merely knowing that his conduct will cause the acts giving rise to the 93A violation. The type of knowledge required is that the acts themselves are unfair or deceptive. Knowledge that a representation when made is false is also knowledge that the representation is practically certain to cause a deceptive result. A knowing state of mind in connection with a claim of unfair insurance claim settlement exists at least where an insurance company forces an insured to litigate clearly valid claims.

A willful state of mind for purposes of 93A also probably exists where the defendant acted recklessly, as opposed to intentionally or with knowledge. . . .

***

In order to justify an award of double or treble damages the willful or knowing unfair or deceptive acts must be causally connected to the claimed loss. Willful or knowing acts which are merely part of the defendant's overall conduct, but which are not the cause of the plaintiff's loss, will not support an award of multiple damages.

Id. (footnotes omitted).  Accordingly, the "willful and knowing" standard for purposes of

Chapter 93A is not the same as the standard for willfulness under § 523(a)(6).  Under §

523(a)(6), only "a debtor who intentionally acts in a manner he knows, or is substantially

certain, will harm another may be considered to have intended the harm and, therefore, to

have acted willfully."  Slosberg, 225 B.R. at 19.

Although this Court frequently has adopted an objective standard for evaluating §

523(a)(6) claims, this case fits squarely within the conundrum noted by the court in Kane,

namely that "a purely objective substantial certainty analysis would bring the court

dangerously close to the recklessness standard decried in <u>Kawaauhau</u>." 470 B.R. at 942.

Although the District Court made detailed findings about the Debtor's actions, this Court

is unable to discern whether he specifically intended to injure the Plaintiffs, although

clearly he intended the acts that led to their injury in disavowing a contract in bad faith.

In this regard, the Court is mindful of the words of the Supreme Court in <u>Geiger</u>:

> The Kawaauhaus' more encompassing interpretation could place within the
> excepted category a wide range of situations in which an act is intentional,
> but injury is unintended, i.e., neither desired nor in fact anticipated by the
> debtor. Every traffic accident stemming from an initial intentional act—for
> example, intentionally rotating the wheel of an automobile to make a
> left–hand turn without first checking oncoming traffic—could fit the
> description. A "knowing breach of contract" could also qualify. A
> construction so broad would be incompatible with the "well-known" guide
> that exceptions to discharge "should be confined to those plainly expressed."

523 U.S. at 62 (citations omitted).

Upon consideration of the case law discussed above, in particular the Supreme

Court's reasoning in <u>Geiger</u>, and the standards applicable to awarding damages under

Mass. Gen. Laws ch. 93A, § 11, this Court concludes that application of the doctrine of

collateral estoppel for purposes of § 523(a)(6) is unwarranted in the present case.  A breach

of contract action, even one involving bad faith and outrageous conduct warranting double

damages and attorneys' fees under Mass. Gen. Laws, ch.93A, § 11 simply does not involve

an intentional tort.  *See* <u>Geiger</u>, 523 U.S. at 61 ("the (a)(6) formulation triggers in the

lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless

torts.").  An award of damages under Chapter 93A may stem from intentional or reckless

conduct, and while the District Court laced its decision with derisive descriptions of the

Debtor's conduct, his intent to injure the Plaintiffs remains illusive because § 523(a)(6) requires a deliberate or intentional injury, not just an intentional or deliberate act that leads to injury (or a deliberate act that is unfair or deceptive). *See* Jendusa-Nicolai v. Larsen, 677 F.3d at 322.

Because of the absence of direct and circumstantial evidence of the Debtor's intent to injure the Plaintiffs, coupled with his admittedly self-serving statements that he was willing to settle with the Plaintiffs and pay the contractual amount due, the issue before this Court is whether the "injury" was a substantial certainty to result from the Debtor's intentional acts. That issue was not before the District Court, and, accordingly, the Plaintiffs failed to establish all the elements for application of collateral estoppel.

The Plaintiffs, in effect, contend that the "injury" was the full amount of the judgment. Had the Debtor admitted that IRC Re, which may have been insolvent, was unable to satisfy its obligations under the contract for 19% of the retroceded risk, the Plaintiffs' harm would have been limited to the contractual damages. The Debtor, however, denied the existence of a contract and engaged in bad faith litigation. It is unclear whether he intended to injure the Plaintiffs when he disavowed the contract, whether he intended to injure the Plaintiffs when he engaged in protracted litigation, or whether he had other motivations, such as avoidance of payment and the day of reckoning. He raised defenses to the Plaintiffs' claims, too late according to the District Court, but the court discussed them at length. Had those defenses been raised earlier, they may have been meritorious. Accordingly, it is conceivable that the substantial certainty of harm was not

the contract damages per se but the substantial attorneys' fees incurred by the Plaintiffs, but the Plaintiffs did not seek to except that component of their claim from discharge. Indeed, the District Court appeared to recognize this, stating that the Debtor's outrageous conduct pre-, post- and during the litigation" "turn[ed] what should have been a routine claim against a reinsurer into a tortuous marathon." 764 F. Supp. 2d at 282.

As a result of the Court's conclusion that the Plaintiffs failed to satisfy the "willful" component of the "willful and malicious injury" requirement of §523(a)(6), the Court need not discuss whether the Debtor's actions were malicious.

## VI. CONCLUSION

For the reasons set forth above, the Court shall enter an order denying the Plaintiffs' Motion for Summary Judgment.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  February 14, 2013